| | |
|---|---|
| SANDRA KINNEY ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | |
| **v.** ) | **Case No.:** |
| ) | |
| ) | |
| MAIN STREET OF ATHENS, INC., ) | |
| STUART MASON, MARILYN MILLER, ) | |
| ASHTON ROBINSON BURROWS, ) | |
| TYLER FORREST, HUGH WILLSON, ) | |
| III, JORDAN CURTIS, STEVE ) | |
| SHERLIN, and PERRY MCCOWAN ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## COMPLAINT

Plaintiff Sandra Kinney, by and through counsel, brings this action against Main Street of Athens, Inc., Stuart Mason, Marilyn Miller, Ashton Robinson Burrows, Tyler Forrest, Hugh Willson, III, Jordan Curtis, Steve Sherlin, and Perry McCowan for actions arising out of Main Street wrongfully terminating Kinney for raising concerns and refusing to remain silent about Main Street's violations of the Fair Labor Standards Act, the conspiracy to oust her from office, as well as the defamatory statements made about her by Defendants during the time of the wrongful termination, and allege as follows:

### INTRODUCTION

1.     Sandra Kinney ("Kinney") was hired to professionalize Main Street of Athens, Inc. ("Main Street"). In the course of her work, she uncovered governance failures, conflicts of interest,

1

and violations under the Fair Labor Standards Act ("FLSA"). Rather than fix those problems, the people responsible removed her, fabricated a reason for her termination, and then enlisted others to spread a false story about her and suppress scrutiny.

2. Athens, Tennessee is a town of 14,000 halfway between Chattanooga and Knoxville. It is a close-knit community in which public officials, civic organizations, and community leaders often work closely together.

3. Kinney, who settled in Athens just a few years ago, soon found out the hard way that in Athens who you know carries the most weight. With a strong business background and public-spirited mindset, Kinney quickly found a role helping to improve city life as Executive Director of Main Street. But her commitment to running the nonprofit in accordance with good business practices—and the law—put her on a collision course with powerful interests in town.

4. After she exposed conflicts of interest and illegal activity, members of Main Street's board (the "Board") voted to terminate her and then set out to craft a false narrative for their retaliatory termination. Board members, public officials, and others in the community coordinated with one another and spread defamatory and false claims that Kinney had been fired for lying to the Board.

5. Stuart Mason, Tyler Forrest, Marilyn Miller, Ashton Burrows, and Hugh Willson pressured City officials to back down on their scrutiny of Main Street's decision to terminate Kinney and its financial issues that Kinney had brought to light. When the City Manager kept pressing for answers, they conspired with the City Councilmembers Jordan Curtis, Steve Sherlin, and Perry McCowan to terminate him in an irregular session from which the Mayor and other Councilmember were excluded. By spreading their defamatory and self-serving narrative far and wide, these

2

conspirators have made good on their threat that Kinney would never work in the town again if she did not go quietly.

**PARTIES**

6. Plaintiff Sandra Kinney is a resident of McMinn County, Tennessee. She holds degrees in Computer Information Systems (B.S.) and Public Administration (M.P.A.) and is a seasoned executive leader with experience from numerous roles in the private sector and in higher education. Prior to moving to Tennessee, she served as Senior Director of Institutional Research at Georgia Tech, where she served in strategic planning, workforce development, data collection and analysis, and grant management.

7. Defendant Main Street of Athens, Inc. is a Tennessee non-profit, public benefit corporation, with a principal office located at 3B W College St., Athens, Tennessee 37303. Main Street's stated purposes include administering the Main Street Athens downtown investment program, fundraising, grant writing, and leading historic preservation and restoration efforts.

8. Defendant Stuart Mason is a resident of McMinn County, Tennessee, and at all relevant times served as President and Board Chair of Main Street.

9. Defendant Marilyn Miller is a resident of McMinn County, Tennessee. Miller is a co-owner of and partner at Miller & McPhail, CPAs ("Miller and McPhail") and holds a B.S. in Accounting from Tennessee Wesleyan University ("TWU"), a private university in Athens, Tennessee, at which she also serves on the Board of Trustees. Miller served on Main Street's Board as Treasurer until her term expired at the end of 2024.

10. Defendant Ashton Robinson Burrows is a resident of McMinn County, Tennessee. Burrows is an employee of Miller & McPhail. Burrows served on Main Street's Board as Treasurer from January 2025 until she resigned in February 2026.

3

11. Defendant Tyler Forrest is a resident of McMinn County, Tennessee. Forrest is the President of TWU and served as a member of the Main Street Board at all relevant times.

12. Defendant Hugh Willson, III is a resident of McMinn County, Tennessee. Willson served as a member of the Board until he resigned in February 2026.

13. Defendant Jordan Curtis is a resident of McMinn County, Tennessee. Curtis served as City Vice Mayor and Councilmember at all relevant times.

14. Defendant Steve Sherlin is a resident of McMinn County, Tennessee. Sherlin served as City Councilmember at all relevant times.

15. Defendant Perry McCowan is a resident of McMinn County, Tennessee. McCowan served as City Councilmember at all relevant times.

## JURISDICTION AND VENUE

16. The Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3) over Kinney's claims under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and the Constitution by way of 42 U.S.C. §§ 1983 and 1985.

17. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Kinney's state-law claims—retaliatory discharge, defamation, false light, and civil conspiracy—because they are so factually inextricable from her federal claims as to "form part of the same case or controversy." 28 U.S.C. § 1367(a).

18. Venue is proper because a substantial part of the events giving rise to Kinney's claims occurred in Athens, Tennessee and its environs, all within this District. Main Street is headquartered in Athens, all individual Defendants reside in this District, and their actions took place in or around Athens. 28 U.S.C. § 1391(b)(2).

4

19. This Court has personal jurisdiction over Main Street because it is a Tennessee corporation with its principal place of business in Athens, Tennessee.

20. This Court has personal jurisdiction over all individual Defendants because they all reside in Tennessee and their acts, giving rise to this lawsuit, took place in Athens, Tennessee.

## STATEMENT OF FACTS

### I. Main Street Functioned as a State Actor

21. Main Street is a Main Street America accredited group, meeting national accreditation standards, and is backed by the Tennessee Main Street Program[1] ("TMS"). TMS is administered by the Tennessee Department of Economic and Community Development ("TNECD") and "follows the proven downtown revitalization model developed by the National Main Street Center."[2] TMS provides grants like the Tennessee Downtowns program, an award up to $500,000 to Main Street groups to improve their cities.[3] The TNECD requires that all main street organizations maintain an independent nonprofit governing body, provide accurate reporting of annual reinvestment statistics, have a sufficient and sustainable finances, and have a paid manager/director, among other things.[4]

22. Although organized as a Tennessee nonprofit corporation, Main Street and the City of Athens (the "City") are heavily intertwined and the City exercises substantial control over Main Street's governance. For example, Section 2.1 of Main Street's Bylaws (attached as **Exhibit A**), makes City Manager and Chamber of Commerce President (as well as the County Mayor and

---

[1] Main Street Athens, *Main Street Athens - "The Friendly City" Founded 2016*, https://www.athensmainstreet.com/about/; Main Street America, *Designation Tiers*, https://main-street.org/our-network/community-evaluation-framework/designation-tiers.

[2] Tenn. Dept't of Econ. & Cmty. Dev., *Tennessee Main Street*, https://www.tn.gov/ecd/rural-development/tennessee-main-street/tennessee-main-street.html.

[3] Tenn. Dept't of Econ. & Cmty. Dev., *Downtown Improvement Grant Program*, https://www.tn.gov/ecd/rural-development/tennessee-main-street/downtown-improvement-grant-program.html.

[4] Tenn. Dept't of Econ. & Cmty. Dev., *Tennessee Main Street*, https://www.tn.gov/ecd/rural-development/tennessee-main-street/tennessee-main-street.html.

5

Economic Development Director) ex-officio voting members of the Board. The City Mayor, Larry Eaton, attends all Board meetings and receives all notices to monitor Main Street's activities.

23. Section 5.1 of Main Street's Bylaws requires annual reporting and approval by the City Council to continue operating: "[t]he Board or the officers shall meet with the Mayor of the City of Athens, the President of the Downtown Business Association, and the CEO/President of the Chamber of Commerce…and the annual renewal report submitted for the Main Street Athens program will be provided to them when submitted to the National Main Street program for approval."

24. Main Street also performs governmental functions and receives substantial public funding from the City—including $50,000 annually in funding—administers public grants, works closely with municipal officials on economic development initiatives, and serves as the City's designated local affiliate within the TMS Program. Through this extensive financial support, shared governance, appointment authority, public oversight, and integration into municipal economic development efforts, Main Street functioned as a joint participant with the City in carrying out public functions traditionally associated with municipal government.

25. The nexus with the City is so intimate that—during the time Main Street was being heavily scrutinized (detailed more below)—TMS Director Kim Parks referenced making Main Street entirely public and replacing the existing Board of Directors with a City-affiliated Advisory Board.

26. At its core, Main Street exists to carry out the City's downtown revitalization and historic preservation efforts.

6

## II. Kinney's Background, Hiring, and Early Achievements as Director of Main Street

27. During the COVID-19 Pandemic, Kinney and her husband Michael Stevenson relocated to Athens to enjoy a quieter, more laid-back lifestyle. Kinney quickly became actively involved in the civic life of her community. She joined the Kiwanis Club, the Athens Arts Center, the McMinn County Living Heritage Museum, Athens Area Chamber of Commerce, and Business Networking International, where she developed a reputation for conscientious service.

28. In early 2024, Main Street approached Kinney and asked whether she would be interested in serving as the Executive Director of Main Street, explaining that the organization needed experienced, strong leadership. Kinney was hesitant at first, as she earned approximately $180,000 to $220,000 per year in her roles prior to moving to Athens, but ultimately decided to accept the part-time position because she wanted to make a positive impact in the community.

29. On April 1, 2024, Kinney began her employment as Director of Main Street. She set about modernizing and professionalizing Main Street's operations. With her background in public university administration, she was adept in securing government grants and secured $482,833 in grants during her first two years with Main Street, up significantly from previous years. Main Street's net assets grew from $72,607 to $281,407 during Kinney's first year, reflecting, among other things, its acquisition of a building valued at over $188,000.

## III. Main Street's Governance Failures and Conflicts of Interest

30. Though Kinney was making strides in improving Main Street's financial position and advancing its mission, she soon discovered that Main Street suffered from serious operational and governance deficiencies.

31. The Board operated without meaningful policies or procedures, lacked basic checks and balances, and maintained its finances in a manner that was less than optimal for transparency and informed operational decision-making.

32. The Board's financial oversight was further compromised by obvious conflicts of interest: Marilyn Miller had been both Main Street's Treasurer (with a seat on its Board) and a co-owner of Miller & McPhail, an Athens accounting firm that serves as Main Street's external vendor for accounting and payroll services. When Miller's term expired at the end of 2024, Ashton Burrows, a subordinate of Miller and an employee of Miller & McPhail, took over as Main Street's Treasurer. However, Miller continued to be involved and exerted considerable influence behind the scenes.

33. The lack of financial oversight did more than enable Main Street's cozy relationship with Miller & McPhail; it also created a pathway for Main Street resources, including in some instances City funds, to be steered toward TWU priorities by a Board heavily intertwined with TWU. From 2021 through 2023, Main Street paid TWU $70,000, reported those payments on its 990 Forms under "Other Expenses," and provided no description of their purpose. That omission is especially troubling because at least half of Main Street's Board—seven of fourteen members—have strong TWU ties: Tyler Forrest serves as TWU's President; Anne Montgomery, Ashton Burrows, and Jackie Newman are TWU instructors; Willson, Burrows, Justin Coffman, and Brianna Baker are TWU alumni; and Marilyn Miller serves as a TWU trustee along with Hugh Willson III's father, Paul Willson.

34. Between March and September 2025, Kinney repeatedly requested that the Organization Committee adopt basic governance policies, discuss financial management, human resources, and other necessary policies and procedures. She identified multiple critical governance

8

deficiencies, including the absence of a Conflict-of-Interest Policy; a Document Retention and Destruction Policy; ongoing education for board members regarding their legal duties of care, loyalty, and financial oversight; an employee handbook; structured performance reviews; and clear policies regarding employee transitions. She also discovered other broader financial misconduct, including misuse and intermixing of grant monies directed to causes outside of the grantors' intended use. All of Kinney's requests were ignored by the Board.

## IV.     Financial Irregularities and Violations of the FLSA

35.     In early January 2026, Kinney discovered that Main Street had violated the FLSA on multiple occasions with respect to one of its employees, Maggie Aird.

36.     Aird was hired in August 2025 to work twenty hours per week, at $15 per hour, as the manager of Main Street's "The Food Hub," a full-service, shared-use commercial kitchen. The Food Hub was created to operate as an independent unit of Main Street where tenants lease space to test out concepts and pricing, develop processes and procedures, and be coached on sound business practices.

37.     For the months of October, November, and December 2025, Aird worked well over her normal twenty hours per week managing the Food Hub and its tenants. These hours were recorded but deducted from her paycheck. Specifically, Aird worked 208 hours in October (she was paid $1,200), 131 hours in November (she was paid $1,200), and 84.53 hours in December (she was paid $300).

38.     On January 5, 2026, Kinney informed Main Street President and Chair, Stuart Mason, of the FLSA violations and requested that they be corrected. Mason said he would address the matter with Burrows as Board Treasurer. However, nothing was done.

9

39. On January 21, 2026, Kinney questioned Burrows about the FLSA violations. Nothing was done.

40. On January 27, 2026, Kinney called Mason to correct the FLSA violations. Nothing was done.

41. At the January 2026 Board meeting, Burrows presented Main Street's 2025 financials, which had been drafted by Miller & McPhail. As part of the presentation, Burrows informed the Board that the Food Hub had lost approximately $12,000 in 2025 and needed to be shut down. Board member Lisa Mayfield, along with others, raised serious questions regarding the presentation and issues surrounding the Food Hub.

42. After the January 2026 meeting, Kinney and Mayfield learned of more inconsistencies with Main Street's financials, including, but not limited to:

    a. Omissions of revenue within Food Hub financial reports;

    b. Inconsistencies between recorded deposits and rental income;

    c. Absence of corresponding monthly deposits despite ongoing rent collection; and

    d. Two checks written by Scottie Mayfield were not reflected in year-end reporting but recorded in subsequent period.

43. At the February 2026 Board meeting, Mayfield raised her concerns about the 2025 financials and requested that they be corrected. Kinney was not present at this meeting. The Board ignored Mayfield's concerns.

44. The day after the February meeting, Burrows resigned from the Board without reason. A few days later, Hugh Willson resigned. Upon information and belief, these individuals stepped down due to the Board's questionable practices coming under scrutiny.

45. The Board ceased all communication with Mayfield after the February meeting without notice and did not include her in emails moving forward. She later learned that her board term was not being renewed (even though she was already two months into her second term) and three other Board members whose terms had also expired in December—including Board President and Chair Stuart Mason—received extensions. Mayfield's term had clearly been renewed, but the Board removed her because she was raising questions they did not want investigated.

46. On March 1, 2026, Kinney contacted an accounting firm to do an outside audit of Main Street. In response to Kinney's inquiry, Miller, who was no longer on the Board, emailed Kinney accusing her of poor financial management. Then, unsurprisingly, after an internal discussion between Miller and the Board, Main Street decided not to proceed with an external audit.

47. On March 7, 2026, Kinney again questioned Mason and Board member Jody Harrison about the FLSA violations regarding Aird's pay. Mason acknowledged authorizing the deductions over time but intentionally chose not to address the violation.

48. Kinney continued raising concerns with the Board over Mayfield's termination, governance failures, financial irregularities, conflicts of interest, and violations of the FLSA. Despite knowing of the issues surrounding the Board, and particularly the acknowledgement that it violated the FLSA, the Board refused to address the problems.

## V. Conspiracy to Terminate Kinney, the City's Intervening, and Kinney's Termination

49. Rather than investigate the concerns Kinney raised or correct the underlying problems, the Board began coordinating to remove Kinney from her position and deflect legitimate scrutiny with a false narrative designed to justify her termination and conceal their unscrupulous conduct.

11

50. On March 17, 2026, Board members Tyler Forrest, Mason, and others met with Burrows and Miller (despite none of them being current Board members) at the offices of Miller & McPhail to discuss how to get rid of Kinney. They deliberately conspired to get rid of Kinney for no valid reason except to prevent a further investigation into their negligent, and potentially unlawful, actions.

51. The following day, Forrest and Mason met with other Board members to secure support for Kinney's removal.

52. On March 19, 2026, Mason, Forrest, and Harrison met with Kinney. Mason and Forrest pressured her to resign and made it clear that if she did not resign, she would be terminated and implied reputational harm. Forrest also told Kinney that she would have a hard time finding a job in the area if she did not resign. Kinney asked to meet with the entire Board, but that request was ignored.

53. On March 20, 2026, City Manager Randy Dowling and Mayor Larry Eaton, on behalf of the City, sent a letter to the Board expressing deep concern about "the unexpected and forced termination" of Kinney "without much public notice" and requested an immediate review of the Board's actions. **Exhibit B.** The City specifically requested that the Board "refrain from any additional personal actions or operational issues" until the City had an opportunity to review the circumstances. The Board never responded to the City's letter.

54. That same day, Mayor Eaton requested an official audit of Main Street from the State.

55. On March 26, 2026, Kinney received an email from the Board to "solidify the termination." **Exhibit C.** A termination letter (backdated to March 19, 2026) was attached to the email, which stated that the Board had determined "a change in leadership is necessary to move

12

the organization forward" and that the decision was "not a reflection of a single incident but rather the Board's assessment of the organization's current needs and long-term direction." **Exhibit D.** The termination letter contained no reference to any performance deficiency, misconduct, or dishonesty on the part of Kinney.

## VI.     Defamatory Statements and the Pressure Campaign

56.     Instead of responding to the demands in the City's letter, Mason and Forrest told Mayor Eaton that the reason for Kinney's termination was that she had lied to the Board about a potential tenant for the Food Hub. Mayor Eaton took the simple step of calling up the potential tenant in question, who quickly disproved the false accusations against Kinney. He also looked into the Board's records regarding the Food Hub, which disproved the narrative that Kinney had lied.

57.     At the April 2, 2026 Board meeting, Mayor Eaton presented the Board with the easily obtained information and documentation that demonstrated that Kinney did not lie to the Board. A member of the Board then asked Mason why Kinney was fired, to which he responded, "I can't tell you."

58.     Despite knowing Kinney had not lied to the Board, Forrest, Mason, and Miller continued repeating this false narrative to others. Specifically, immediately after the April 2 Board meeting, they told City Councilmembers and others that Kinney was fired because she had lied to the Board. Burrows joined in the defamatory campaign, repeating the lies about Kinney to her friend Ben Burchfield, the City's Public Works Director, as well as Derek Phillips, the City's Parks & Recreation Program Coordinator. Even though the Mayor disproved the false narrative that Kinney lied to the Board, no one conducted any investigation into whether Kinney had actually lied before repeating that accusation to third parties. At no point have Defendants retracted their false

accusations, corrected the public record, or informed those to whom they published the statements that the accusations against Kinney were false.

59. At the April 21 City Council meeting, Mayor Eaton and Manager Dowling addressed the lies surrounding Kinney's termination and reiterated the need for oversight of Main Street.

60. Forrest, Mason, Burrows, Miller, and Willson then began pressuring the City Councilmembers and officials to rescind the Mayor's request for a State audit and have the City rescind their letter requesting documentation from Main Street. They were successful in quashing the State audit request (soliciting the help from the City Attorney) but were unable to get Mayor Eaton or Manager Dowling to rescind the letter requesting information from Main Street.

61. Once Mason, Forrest, Miller, Burrows, and Willson saw that the City was not going to give into pressure and rescind the letter—which would have exposed Main Street's problematic practices—they conspired to oust Manager Dowling and began coordinating with Vice Mayor Jordan Curtis (who is very close with Willson and likely under pressure from him) and Councilmembers Steve Sherlin and Perry McCowan. The objective was clear—remove Manager Dowling from office to prevent further investigation into Main Street.

## VII. Termination of City Manager Dowling

62. Prior to June 4, Vice Mayor Curtis and Councilmembers Sherlin and McCowan had two secret meetings without Mayor Eaton or the other Councilmember John Duggan (a violation of open meetings law). Upon information and belief, they discussed terminating Manager Dowling in these secret meetings. They later characterized these as closed-door executive sessions about which they could not comment—even to Mayor Eaton or Councilmember Duggan.

63. The City Council then called a special session for June 4, 2026. On the agenda was whether to terminate Manager Dowling. Numerous Athens residents came forward to express support for Manager Dowling, confusion about why his job was being threatened, and objections to firing him.

64. The June 4, 2026 Special Session[5] consisted of the following testimony from Mayor Eaton:

a. He was being kept in the dark about why Manager Dowling was being fired but attributed the decision to the March 20 letter to Main Street regarding Kinney's termination.

b. Some of the Councilmembers had been secretly conferring together in advance of the meeting and that he had been warned to "watch himself" and "to hush up about this" with threats of being removed from meetings.

c. He pointed out that the City's head of human resources advised there had been no complaints by City employees about Manager Dowling.

d. He and Manager Dowling had been involved in negotiations with major retailers looking to set up shop in Athens, which would be threatened by Manager Dowling's termination.

e. He voted to postpone the vote until the public had been informed of whatever issues the City Council had with Manager Dowling. The vote was defeated 3-2.

f. He proposed a measure to let the Tennessee Comptroller examine and weigh in on whether two of the City Council's executive closed-door sessions complied with state open meetings law. That proposal too was shot down 3-2.

---

[5] City of Athens, (Jun. 4, 2026), https://vimeo.com/event/5971792.

65. Councilmember Duggan testified that:

   a. The decision to terminate Dowling was a premeditated decision dating back weeks and doing the will of the few rather than the will of the people.

   b. Manager Dowling was being fired because he was "in the way."

66. Manager Dowling also testified that he had not been given any reason for his termination.

67. The other three members of the City Council, Curtis, Sherlin and McCowan, declined to offer any reason for putting the matter to a vote. They stated only that they had reached the decision in executive sessions and would not comment on it.

68. The City Council ultimately voted 3-2 to terminate Manager Dowling without cause, leaving the City on the hook for a $30,000 payout on top of six months of severance pay.

69. Social media users reacting to the news opined that "He stepped on the wrong toes," asked "No one knows why he is being fired?? Makes no sense! Something ain't right," and described the firing as "small town shady dealings over someone asking the right questions (apparently about the Main Street Director's abrupt and apparently without just-cause firing couple months back[)]."[6]

70. A professor at TWU, Cliff Couch, penned an op-ed decrying the high-profile, costly sacking without any explanation given to the public, suggesting that it was because Dowling "made the wrong people mad."[7]

---

[6] *DEVELOPING: Athens City Manager Dr. Randall Dowling Has Been Terminated Following a 3-2 Vote by the Athens City Council Following a Special Session Thursday*, LOCAL 3 NEWS (Facebook, June 4, 2026), https://www.facebook.com/Local3News/posts/developing-athens-city-manager-dr-randall-dowling-has-been-terminated-following-/1459752736195512/.

[7] Cliff Crouch, *Municipal Government Transparency (or Lack Thereof)*, DAILYPOSTATHENIAN.COM (June 15, 2026), https://www.dailypostathenian.com/opinion/article_f68e8c00-c940-4634-bf47-b80b7238e32f.html.

## VIII.   Kinney's Damages

71.     Following her termination, Defendants' false statements spread rapidly throughout the small Athens community. Because Defendants included respected business leaders, public officials, members of the City Council, and officers of a prominent quasi-state nonprofit organization, their statements carried substantial credibility and were readily accepted as true by members of the community. As a direct result, Kinney's professional reputation, community standing, and future employment opportunities have been severely and continuingly damaged in ways that cannot be fully repaired without public correction.

72.     The false statements that Kinney was terminated because she "lied to the Board" have caused severe and ongoing damage to Kinney's professional and personal reputation, personal humiliation, mental anguish, emotional distress, and loss of standing in the Athens community.

73.     Kinney has received numerous calls and texts from Athenians demanding to know what she had supposedly "lied" about. She continues to endure unwelcome stares and disparaging remarks from members of the public during routine interactions in the community. Kinney has also been pressured to step down from other local boards and public-service roles solely because of the false allegations made by the Board and others.

74.     These false statements have placed Kinney in a false light before the public, portraying her as a dishonest person who was terminated for lying to her employer, when in fact she was terminated in retaliation for raising concerns about financial irregularities, governance failures, and violations of federal law.

75.     Kinney has suffered economic damages, including lost wages and lost earning capacity. She accepted substantially lower compensation at Main Street than she was accustomed to

because she wanted to serve her community and contribute meaningfully in the nonprofit sector. Now, however, the retaliation and defamatory comments have substantially impaired her ability to secure comparable employment in either the private or nonprofit sector.

76. There is no sign that the publication of the false statements will stop anytime soon—as of filing this Complaint, Kinney continues to hear these false statements anywhere she goes in Athens. Unless and until Main Street and its Board take prompt corrective action, Kinney's reputation and ability to serve her community will continue to suffer.

## CLAIMS FOR RELIEF

### COUNT I – Violation of Fair Labor Standards Act

### 29 U.S.C. §§ 206, 207, 215(a)(3)

### (against Main Street)

77. Kinney repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

78. The FLSA imposes minimum wage, overtime, and recordkeeping requirements on employers.

79. Kinney was at all times relevant to this count an employee of Main Street, as was Maggie Aird.

80. Kinney learned in January 2026 that Main Street violated the FLSA on multiple occasions by not paying Aird for overtime hours and by making improper deductions in October, November, and December 2025.

81. On January 5, 2026 Kinney reported the FLSA violations to Stuart Mason, as President of Main Street. Mason said he would address it with Burrows, as Treasurer, but nothing was done.

82. On January 21, 2026, Kinney reported the FLSA violations to Burrows. Nothing was done.

83. On January 27, 2026, Kinney called Mason to correct the FLSA violations. Nothing was done.

84. On March 7, 2026, Kinney again reported to Mason and Harrison that Main Street was in violation of the FLSA. Mason admitted to the violations but took no steps to address them.

85. Meanwhile, Miller and Burrows, who both work at Miller & McPhail, the firm responsible for Main Street's payroll, were offended that their decisions were being scrutinized.

86. Instead of addressing its violation of federal law, Main Street tried to cover it up by terminating Kinney and warning her to go quietly.

87. Because she reported Main Street's violation of the FLSA with respect to Aird, Main Street's Board unjustly and illegally terminated Kinney from her role as Director of Main Street and did not reinstate her.

**COUNT II – Retaliatory Discharge**

**Tenn. Code Ann. § 50-1-304(b)**

**(against Main Street)**

88. Kinney repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

89. Kinney first put Main Street on notice of potential conflicts of interest and financial irregularities in June 2025. The Board refused to acknowledge the issues.

90. Kinney learned in January 2026 that Main Street had violated the FLSA by not paying Aird for overtime hours and making improper deductions in October, November, and December 2025.

19

91. Kinney reported the FLSA violations to members of Main Street's Board on multiple occasions, including in January and March 2026. The Board President admitted to the violations but refused to act or remedy them.

92. Main Street terminated Kinney because she refused to remain silent about illegal activities—violations of the FLSA, financial irregularities, and conflicts of interest issues.

93. Kinney is entitled to damages, reasonable attorney fees and costs.

**COUNT III – Conspiracy for Deprivation of Civil Rights**

**42 U.S.C. § 1983 & 42 U.S.C. § 1985(3)**

**(against Stuart Mason, Marilyn Miller, Ashton Robinson Burrows, Tyler Forrest, Hugh Willson, Jordan Curtis, Steve Sherlin, and Perry McCowan)**

94. Kinney repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

95. In speaking out about financial improprieties and unlawful activity engaged in by Main Street, an entity financially backstopped by and operationally intertwined with the City, Kinney engaged in protected speech on a matter of public concern. She informed the Board on multiple occasions of the fraudulently mismanaged use of City funds, the multiple FLSA violations, public grants mismanagement with TWU, governance issues, and public accountability.

96. Defendants Stuart Mason, Marilyn Miller, Ashton Burrows, Tyler Forrest, Hugh Willson, and later Jordan Curtis, Steve Sherlin, and Perry McCowan formed and coordinated a plan to destroy Kinney's reputation because she exercised her First Amendment rights by speaking out about Main Street's illegal activity and financial improprieties facilitated or caused by Miller & McPhail.

97. This plan's goal was twofold: (1) to punish Kinney for speaking out, which reflected poorly on Main Street and its accounting/payroll firm Miller & McPhail; and (2) to create

20

a replacement narrative to deflect attention away from and cover up Main Street's illegal activity and financial improprieties.

98. Each co-conspirator shared in this objective and sought to advance it by their actions.

99. Mason, Miller, Burrows, and Forrest set the plan in motion by meeting on March 17, 2026 at the offices of Miller & McPhail, where they decided to fire Kinney and concocted a false explanation for doing so—that Kinney had lied to the board.

100. They then called a meeting of the Board the following day to secure approval to fire Kinney.

101. After a quorum of the Main Street Board voted to fire Kinney, Mason, Forrest, and Harrison met with Kinney to inform her of the Board's decision and pressure her to resign.

102. At the close of that meeting, Forrest advised Kinney that things would go smoothly if she resigned but if the Board had to fire her, it would be hard for her to find a job in Athens or McMinn County.

103. After the City sent a letter to the Board opposing Kinney's termination and demanding supporting documentation, the conspirators added a new goal: to derail the City's inquiry into the circumstances surrounding its firing of Kinney, thereby leaving hidden the illegal activity and financial improprieties Kinney had brought to light.

104. Pursuant to this goal, Mason and Forrest spoke with Mayor Eaton in an effort to influence him to retract the letter. They told the Mayor Kinney was fired for lying to the Board, and doubled down on that statement after the Mayor demonstrated in real time that it was false.

105. After the City refused to retract the letter, the original conspirators continued to circulate their false narrative about why Kinney was being fired, repeating it to City employees, City councilmembers, and various members of the public.

106. They enlisted the help of three City councilmembers—Vice Mayor Curtis, Steve Sherlin and Perry McCowan—to lend legitimacy to their narrative and put pressure on the City Manager.

107. These three then participated in executive sessions without the two remaining members of the City Council, Mayor Eaton and Councilmember Duggan, in which they made clear their intention to fire City Manager Dowling.

108. In the June 4 special session, Sherlin, Curtis, and McCowan voted as a bloc to fire Manager Dowling, while refusing to provide any reason for doing so.

109. The actions of Stuart Mason, Marilyn Miller, Ashton Burrows, Tyler Forrest, Hugh Willson, Jordan Curtis, Steve Sherlin, and Perry McCowan have harmed Kinney's good reputation in the community, obstructed City officials' efforts to prevent her from being fired, reinstate her, or vindicate her concerns about Main Street's unlawful and unethical activities, and made it practically impossible for her to secure another local job in the future, as Forrest threatened.

110. As a direct and proximate result of their actions, Kinney has suffered economic damages including lost wages, lost benefits, and lost earning capacity, and non-economic damages including emotional distress, humiliation, and damage to professional reputation.

### COUNT IV - Defamation

**(against Stuart Mason, Tyler Forrest, Marilyn Miller, Ashton Robinson Burrows)**

111. Kinney repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

112. Beginning on or about April 2, 2026, Mason, Forrest, Miller, and Burrows knowingly and repeatedly made defamatory statements about Kinney—that she was fired because she lied to the Main Street Board—to third parties including City councilmembers, City employees, and members of the public.

113. At no point has Mason, Forrest, Miller, or Burrows retracted their false accusations, corrected the public record, or informed those to whom they published the statements that the accusations against Kinney were false.

114. Mason, Forrest, Miller, and Burrows made these statements knowing that they were false or without taking any steps to ascertain whether they were true.

115. Kinney suffered injury to her character and reputation as a result of these statements.

116. As a direct and proximate result of the defamatory statements, Kinney has suffered actual damages including impairment of reputation and standing in the community, personal humiliation, mental anguish and suffering, and economic harm.

117. Kinney's professional reputation has been severely damaged.

118. Kinney has been unable to secure employment in her field as a direct result of the defamatory statements, resulting in loss of income and earning capacity.

119. Kinney has also been forced out of or otherwise excluded from pro bono roles because of the defamatory statements.

120. Kinney has suffered non-economic damages including emotional distress, anxiety, humiliation, and damage to personal and professional relationships.

## COUNT V – Civil Conspiracy

### (against Stuart Mason, Tyler Forrest, Marilyn Miller, Ashton Robinson Burrows, Hugh Willson, Jordan Curtis, Steve Sherlin, and Perry McCowan)

121. Kinney repeats and realleges the allegations set forth in the paragraphs above as if fully set forth herein.

122. Defendants Stuart Mason, Marilyn Miller, Ashton Burrows, Tyler Forrest, Hugh Willson, and later Jordan Curtis, Steve Sherlin, and Perry McCowan, had a common design to defame and discredit Kinney to cover up Main Street's violation of the FLSA, financial irregularities, conflicts of interest, and other improprieties.

123. Mason, Miller, Burrows, Forrest, and Willson first sought to accomplish their goal by firing Kinney for exercising her protected rights in hopes of concealing Main Street's illegal activity.

124. Mason, Miller, Burrows, Forrest, and Willson then discovered that Manager Dowling was determined to get to the bottom of Kinney's termination and the financial issues she had uncovered. They then coordinated with Jordan Curtis, Steve Sherlin, and Perry McCowan to fire the City Manager in furtherance of the conspiracy.

125. The actions of Mason, Miller, Burrows, Forrest, Willson, Curtis, Sherlin, and McCowan have harmed Kinney's good reputation in the community, obstructed City officials' efforts to prevent her from being fired, reinstate her, or vindicate her concerns about Main Street's unlawful and unethical activities, and made it practically impossible for her to secure another local job in the future, as Forrest threatened.

126. As a direct and proximate result of their actions, Kinney has suffered economic damages including lost wages, lost benefits, and lost earning capacity, and non-economic damages including emotional distress, humiliation, and damage to professional reputation.

24

## PRAYER FOR RELIEF

WHEREFORE, Kinney respectfully requests that this Court enter judgment in favor of Kinney and against Defendants as follows:

a. Compensatory damages against Defendants for economic losses, including lost wages, lost benefits, loss of earning capacity, and inability to secure subsequent employment, in an amount to be determined at trial;

b. Compensatory damages against Defendants for non-economic losses, including pain and suffering, emotional distress, mental anguish, humiliation, and damage to reputation and standing in the community, in an amount to be determined at trial;

c. Punitive damages against Defendants in an amount to be determined at trial based on Defendants' intentional, malicious, fraudulent, and reckless defamatory statements about Kinney;

d. A trial by a jury of twelve on all issues so triable;

e. Kinney's costs, expenses, and reasonable attorneys' fees under 42 U.S.C. § 1988, 29 U.S.C. § 216(b), Tenn. Code Ann. § 50-1-304(c)(2), and any other applicable provision of law; and

f. Such other and further relief as the Court deems just and proper.

Dated: July 29, 2026

Respectfully Submitted

/s/ *Brandon J. Smith*
BRANDON J. SMITH (TN Bar. No. 037272)
Dylan Harper (TN Bar. No. 036820)
Andrew Wilson (TN Bar. No. 040532)
HOLTZMAN VOGEL BARAN TORCHINSKY
& JOSEFIAK PLLC
1221 Broadway, Suite 2100
Nashville, TN 37203
615-647-8528 (P)
bsmith@holtzmanvogel.com
dharper@holtzmanvogel.com
awilson@holtzmanvogel.com

*Counsel for Plaintiff Sandra Kinney*

26